## UNTIED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

HELENA SOLANO-REED a/k/a
HELENA SOLANO,

             Plaintiff,

                                     CASE NO. 11-14245

v.

                                     HON. MARIANNE O. BATTANI

THE LEONA GROUP, LLC, et al.,

             Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

      This matter is before the Court on Defendants' Motion for Summary Judgment. (Doc. 46). The case involves a dispute between Plaintiff, Helena Solano-Reed, and her supervisors, Defendants Javier Garibay and Juan Martinez, regarding the testing of 11th graders at Cesar Chavez Academy High School ("CCAHS"), owned and operated by Defendant The Leona Group, LLC. For the reasons stated below, the Defendants' motion is **GRANTED**.

## I.    STATEMENT OF FACTS

###     A.    Background

      Plaintiff, Helena Solano-Reed, worked as a guidance counselor from 2006 until 2011 at CCAHS. (Doc. 46 at 1). CCAHS is a public charter school owned and operated by The Leona Group. Solano-Reed was hired on an annual basis, with a renewal of her contract each year until employment ceased in mid - 2011. (Compl. at ¶ 15-18). She received exemplary performance reviews, and was given a raise after the

2010-11 school year.  (Id. at ¶ 20).  Juan Martinez is the principal of CCAHS and Javier Garibay is the Regional Vice President of The Leona Group.

### B.    MME Testing Protocol and Solano-Reed/Martinez Relationship

The State of Michigan requires that all 11th graders take the Michigan Merit Exam ("MME") in order to comply with the No Child Left Behind Act ("NCLBA").  (Doc. 46 at 1; Doc. 54 at 1).  CCAHS receives federal and state funds for its compliance. According to Chris Janzer, Accountability Specialist with the MDE, charter schools have the discretion to set criteria identifying which students qualify as 11th graders.  (Doc. 46 Ex. B, ¶ 6, 7).  At CCAHS, those students with 12 or more credit hours were considered 11th graders eligible to test, and were administered the MME.  (Doc. 46 at 2).

Beginning in early 2010, Defendants prepared to administer the MME to only a portion of students in 11th grade; those who completed 12 credit hours.  Some students were labeled as juniors, but had completed only 10 or 11.5 credit hours.  In February 2010, Solano-Reed attended a conference with officials from the MDE and voiced her concern about the decision not to test all students in 11th grade.  (Compl. at ¶ 30-31). She asserts that MDE officials "noted . . . this was improper."  (Id. at ¶ 32).

In March 2010, Solano-Reed told Martinez that MDE officials believed the testing protocol to be improper.  (Id. at ¶ 33).  However, Martinez proceeded as originally planned.  That summer, Solano-Reed was not asked to direct the summer school program.  (Id. at ¶ 35).  Later in September, she sent out a school-wide email directing teachers to avoid sending students to the guidance office during the first week of school.  (Doc. 46 Ex. H).  Martinez responded via email, voicing his displeasure with such a policy.  (Id.)  In a November meeting with Martinez, Solano-Reed again objected

to the testing protocol.  A series of emails between Martinez and Solano-Reed in December indicates she failed to provide Martinez with information regarding seniors eligible to graduate, and that Martinez was "very let down" by the overall performance of her and her co-employee.  (Id. at Exs. I, J, K).

In January of 2011, Solano-Reed objected to the testing procedures again via email.  (Compl. at ¶ 49).  However, the relationship between her and Martinez further deteriorated after she sent a memo characterizing some of her job responsibilities as "clerical."  (Id. at Ex. L).  Martinez then sent an email to Solano-Reed requesting her to provide information relating to her job responsibilities along with proof that her tasks are "clerical" in nature.  (Id. at Ex. M, p. 4 of 8).  Two days later, she sent Martinez a lengthy email describing that she felt "harassed, intimidated and stressed out by [Martinez's] hostile treatment of [her]."  (Id. at Ex. M, p. 2 of 8).  She also made it known that "[s]everal of my dearest friends are attorneys and I have spoken with them about my work situation and per your request, I will immediately begin to document all of the work that I do . . . ."  (Id.)  After a January 27 meeting with Javier Garibay involving the email exchange, Solano-Reed wrote a memo detailing her encounter.  (Id. at Ex. U).  In it she states,

> "I told Mr. Gariby [sic] and Ms. Griggs that I felt targeted, harassed and intimidated by Mr. Martinez and that no matter what I did, I could not make him happy.  As such, I was under a constant bombardment of e-mails from Mr. Martinez demanding more and more work.  The final culmination resulted in my return e-mail where I voiced my feelings of harassment and intimidation after he sent a secretary into my office with a bright pink high lighted memo that he had previously sent to me via e-mail."

(Id. at 1).  Solano-Reed also indicated to those present that she had a "tortured colon" resulting from the stress of her employment.  (Id.)

3

On February 19, 2011, Solano-Reed sent an anonymous email to MDE inquiring into the legality of the testing protocol regarding the fact that students with 11 or 11.5 credits were not administered the MME.  (Id. at Ex. O.)  In response, an official from the MDE stated that those 11th graders who did not test would be expected to test as 12th graders, but did not otherwise express any concern with the protocol.  (Id. at Ex. P).  On February 27, 2011, she sent an email to a professor at Eastern Michigan University, in which she detailed her concerns with the testing protocol and noted "[Martinez] is trying to now build a case against me."  (Id. at Ex. N).

In April 2011, Solano-Reed sent a memo to William Coats, CEO of The Leona Group, detailing her allegations of harassment and intimidation against Martinez and Garibay.  (Id. at Ex. P).  The memo listed several "acts of harassment," including ignoring her at meetings, providing her with busy work, failing to provide direction, statements made to other employees by Martinez about her, lack of invitations to meetings, and her displeasure that teachers, not counselors, were now meeting with students one-on-one.  (Id.)  After an investigation, Coats responded to the memo in June and stated that Martinez's work requests were reasonable, no evidence of harassment or hostile work environment existed, and the testing protocol was "entirely legal."  (Id. at Ex. Q).  Subsequently, Solano-Reed refused to sign her poor performance review.  (Id. at Ex. R).  Instead, she drafted a seven-page, single-spaced rebuttal, detailing why the review was "malicious."  (Id.).  Soon thereafter, The Leona Group decided not to renew her contract for the upcoming school year.

### C.    The Complaint

On September 27, 2011, Solano-Reed filed a complaint against Defendants alleging a violation of 42 U.S.C. § 1983 for wrongful termination resulting from engaging in First Amendment protected speech, violation of the False Claims Act, violation of the Michigan Whistleblower's Protection Act, and violation of Michigan public policy. Defendants filed a motion for summary judgment, asserting, *inter alia*, Solano-Reed did not engage in protected activity under the statutes and cannot prove causation.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, (1986).  Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts supported by affidavits or other appropriate evidence establishing a genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c)(1)(A). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144,

5

157 (1970). The Court "must lend credence" to the non-moving party's interpretation of the disputed facts. Marvin v. City of Taylor, 509 F.3d 234, 238 (6th Cir. 2007) (citing Scott v. Harris, 127 S.Ct. 1769, 1775 (2007)). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. Hopson v.DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

## III.    ANALYSIS

### A.    First Amendment Retaliation

Solano-Reed's first cause of action is that her contract was not renewed in retaliation for her engaging in protected speech under the First Amendment. Specifically, because she voiced her concerns about the legality of the MME testing protocol at CCAHS, The Leona Group decided to terminate the relationship. In contrast, Defendants assert she was let go based on her poor working performance during the last several months of her employment at CCAHS.

The First Amendment "protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). In order to establish a prima facie case for wrongful termination resulting from retaliation for engaging in speech protected by the First Amendment, a plaintiff must demonstrate "(1) [she] was participating in a constitutionally protected activity; (2) the defendant's action injured the plaintiff in a way likely to deter a person of ordinary firmness from further participation in that activity; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct." Ctr. for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 371 (6th Cir. 2011) (citing

6

Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)).  To be a constitutionally protected activity, the employee must speak as a citizen and the speech at issue must address a matter of public concern.  Murphy v. Cockrell, 505 F.3d 446, 449 (6th Cir. 2007).  Thus, speech made in accordance with an employee's duties is not entitled to protection under the First Amendment.  Garcetti, 547 U.S. at 421.

In order to establish causation, plaintiff must "point to specific, nonconclusory allegations reasonably linking her speech to employer discipline."  Rodgers v. Banks, 344 F.3d 587, 602 (6th Cir. 2003).  If plaintiff creates an inference of causation through direct or circumstantial evidence, the employer must then demonstrate that it would have taken the same adverse employment action regardless of the protected speech.  Eckerman v. Tennessee Dept. of Safety, 636 F.3d 202, 208 (6th Cir. 2010).  The plaintiff must show "the exercise of [her] First Amendment rights was a 'substantial or motivating factor' in the adverse action."  Id. at 209.

      1.   Protected Activity

Solano-Reed failed to provide enough evidence to establish her speech was a matter of public concern.  In her deposition, she admits it is part of her duty under the Ethical Standards for Student Counselors to report her concerns about the testing protocol at CCAHS.  (Doc. 46 Ex. A, p. 70-72).  Her contention is that because the issue involved public school testing and education, it is a matter "undoubtedly of the highest public concern."  Solano-Reed also argues that this type of concern was "extraordinary rather than everyday communication" not within her duties.  See Pucci v. Nineteenth Dist. Court, 628 F.3d 752, 768 (6th Cir. 2010).  However, it is clear from the evidence

that Solano-Reed's numerous objections to the protocol stemmed from her obligations as a guidance counselor.

Although the specific issue regarding education may be of public concern, Solano-Reed did not act a citizen when inquiring about the testing procedures to the MDE and professors at Eastern Michigan University.  She believed this was part of her job; similar to the way she would not be acting as a citizen in advising students about scholarship opportunities.  See 547 U.S. at 422.  In her letter to Coats, Solano-Reed states, "Because I am a Certified School Counselor and because I belong to the American School Counselor Association, I am prohibited from agreeing to Mr. Martinez's decision not to test 50% of the junior class."  (Doc. 46 Ex. P, p.4).  Her statements in this letter and at her deposition indicate her state of mind that it was her duty as a guidance counselor, not an ordinary citizen, to object to the testing protocol. Indeed, it undermines her claim that these were "extraordinary" communications outside the scope of her job.  Essentially, Solano-Reed objected to a practice with which she did not agree as a guidance counselor.  Thus, she was not engaged in constitutionally protected activity in voicing her concerns.

2.    Causation

Even if Solano-Reed could establish she engaged in protected activity, she failed to provide sufficient evidence that her objections to the testing protocol were a substantial or motivating factor in the decision to not renew her contract.  See Eckerman, 636 F.3d at 208.  As evidence of causation, she points to the extra work given to her by Martinez.  However, The Leona Group, investigated the emails Martinez sent and determined they were reasonable and appropriate requests.  (Doc. 46 Ex. Q).

8

Coats noted that it is reasonable for the school principal to request the guidance counselor to assist with keeping track of graduation requirements for students who are in jeopardy of not graduating.  See (Id. at Ex. I).  Likewise, sending an administrative assistant to an employee's office with a pink highlighted email does not amount to harassment.  See (Id. at Ex. U, p. 1).  Solano-Reed's claims indicate nothing more than two employees who did not get along.  Notably, in Garcetti, the Supreme Court cautioned that "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'"  547 U.S. at 420 (citing Connick v. Myers, 461 U.S. 138, 154 (1983)).

### B.     Federal False Claims Act

Solano-Reed next asserts a cause of action under the False Claims Act.  The False Claims Act permits individuals with information exposing fraud committed against the United States to bring a *qui tam* action.  31 U.S.C. § 3730(b).  An individual may also bring an action on their own behalf.  § 3730(h).  In order to establish a prima facie claim under § 3730(h), a plaintiff must prove "1) she was engaged in a protected activity; and 2) that her employer knew about it."  McKenzie v. BellSouth Telecomm., Inc., 219 F.3d 508, 514 (6th Cir. 2000).  In addition, the plaintiff must prove that her employer terminated her employment or engaged in some kind of discrimination against her as a consequence of the protected activity.  Id.  Protected activity includes investigation or other steps taken "in furtherance of [a *qui tam*] action."  § 3730(h).  Although protected activity is to be construed broadly, it must be "reasonably connected to the FCA" and "sufficiently further[ ]" such an action in order to be protected activity.  McKenzie, 219 F.3d at 515-16.  "Although internal reporting may constitute protected

activity, the internal reports must allege fraud on the government." Id. at 516. Furthermore, the employee must provide "sufficient facts from which a reasonable jury could conclude that the employee was discharged because of activities which gave the employer reason to believe that the employee was contemplating a *qui tam* action against it." Id. at 517.

           1.    Protected Activity

Solano-Reed argues that she was engaged in protected activity because she undertook efforts to prevent CCAHS from defrauding the government via funds CCAHS received from the NCLBA. This argument fails for several reasons. First, she provided no evidence she was at all concerned with the government's allocation of funding to a school that fails to properly test its students within the parameters of the NCLBA. Solano-Reed merely found it against her ethical obligations as a guidance counselor. These actions are not "reasonably connected to the FCA" or serve to further a viable *qui tam* action. See Id. at 515-16. None of her reports to The Leona Group or anonymous reports to the MDE detail allegations of fraud.

Solano-Reed incorrectly relies on Bell v. Dean, 2010 U.S. District LEXIS 75740 (M.D. Ala. July 27, 2010), which is clearly distinguishable from the present case. The plaintiff in Bell was actually responsible for filing grant applications with the government in order to secure funding for Title III programs. Id. at *4. His employer pressured him to use the funding for projects not disclosed in the grant application, resulting in unauthorized use of funds, which he refused. Id. Here, Solano-Reed did not take part in any action connected with a false claim for funding from the government. Her internal reporting and anonymous inquiries to the MDE mentioned no concern for misuse of

10

funds.   Solano-Reed directed her concerns at Martinez's harassing treatment of her coupled with her concern about the testing protocol.   There is no evidence in the record that she was concerned with CCAHS's commission of a fraud on the government or that she intended to pursue a *qui tam* action.

### 2.   Causation

Furthermore, Solano-Reed failed to show that "the retaliation was motivated at least in part by [her] engaging in protected activity."   See McKenzie, 219 F.3d at 518. There is no evidence to suggest that The Leona Group believed she was contemplating *qui tam* action against it.   See Id. at 517.   Thus, the nonrenewal of Solano-Reed's contract could not have been motivated by her allegedly protected activity, and she has failed to demonstrate a casual connection.

### C.   Michigan Whistleblowers' Protection Act

Solano-Reed's third cause of action asserts a violation of the Whistleblowers' Protection Act.   The Michigan Whistleblowers' Protection Act ("WPA") prohibits employer retaliation against employees who report suspected violations of law.   See Mich. Comp. Laws § 15.361, *et seq.*  Section 2 of the Act provides in part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or suspected violation of a law or regulation . . . to a public body . . . .

M.C.L. § 15.362.   In order to establish a prima facie case under the Michigan WPA, a plaintiff must show "(1) [she] was engaged in protected activity as defined by the Whistleblower's Protection Act, (2) [she] was discharged, and (3) a causal connection

existed between the protected activity and the discharge." Shallal v. Catholic Soc. Servs. of Wayne County, 566 N.W.2d 571, 574 (Mich. 1997). In order for a plaintiff to qualify as engaging in protected activity, "the plaintiff reasonably must believe a violation of law, regulation, or rule has occurred." Shimkus v. Hickner, 417 F. Supp. 2d 884, 907 (E.D. Mich. 2006). Although an employee who is "about to" report is afforded the same amount of protection as one who has already reported, clear and convincing evidence is required for the former, but not the latter. See Id. at 575; M.C.L. § 15.363(4).

### 1. Protected Activity

Protected activity may be established by demonstrating the employee reported a violation of suspected violation to a public body. See M.C.L. § 15.362. Importantly, The Leona Group admitted it was a public body for purposes of this motion. (Doc. 46 at 16). Indeed, there is no requirement that the public body be an outside agency. See Brown v. Mayor of Detroit, 734 N.W.2d 514, 517 (Mich. 2007) ("It does not matter that if the public body to which the suspected violations were reported was also the employee's employer."). Although the emails to the MDE do not constitute reporting because of their anonymous nature, the Court will assume only for purposes of this motion that Solano-Reed's memo to Coats constituted reporting under the WPA. Consequently, Solano-Reed will not be held to the clear and convincing evidence standard. See M.C.L. § 15.363(4).

In addition, in order to be protected activity, at the time Solano-Reed sent the memo to Coats, she must have possessed a reasonable belief of a violation of law on

12

the part of CCAHS and The Leona Group.  The evidence in the record indicates Solano-Reed failed to meet this standard.

In her deposition, Solano-Reed claims she reported the illegal testing procedures to "Paul" on the phone from the MDE.  (Doc. 46 Ex. A p. 53-55).  However, she provides no detail as to what Paul said or any information from other representatives at the MDE. She claims to have spoken to several individuals, but does not provide any of their names or specific dates and times of the conversations.  (Id. at 54).  Moreover, the anonymous emails she sent to the MDE reinforce the notion that Solano-Reed could not have reasonably believed a violation of the law was taking place at CCAHS.  The MDE's response was not one of emergency or concern.  (Id. at Ex. O).  The Supervisor for Accountability at the MDE made no mention that the practice was illegal or even questionable as long as those non-testing 11th graders tested in 12th grade.  This would have put a reasonable person's concerns to rest.  Most notably, Solano-Reed failed to provide any evidence that any employees present for her open objections over the testing protocol believed them to be a violation of Michigan law.  She claims to have voiced her concerns at a meeting with MDE officials in 2010.  However, she fails to provide any concrete evidence that those officials agreed with her or expressed any concern for the practice.  (Compl. at ¶ 30-31).  She was never cautioned to stop voicing her displeasure by any of the Defendants, and there is no evidence suggesting the practice was illegal by anyone other than Solano-Reed herself.  Consequently, it is clear she could not have had a reasonable belief that the testing protocol violated any Michigan law or regulation.  Thus, she is afforded no protection under the WPA.

2.    Causation

Regardless of whether Solano-Reed engaged in protected activity, she failed to provide evidence of causation.  Michigan law requires more than a temporal connection to show causation.  See West v. Gen. Motors Corp., 665 N.W.2d 468, 473 n.12 (Mich. 2003).  Solano-Reed cited no evidence that the nonrenewal was based on her allegedly protected conduct.  On the contrary, The Leona Group undertook efforts to address Solano-Reed's concerns about the testing protocol and even conducted an internal investigation of Martinez's conduct on her behalf.  This evidence indicates that Solano-Reed's contract was not renewed because of her tumultuous relationship with Martinez along with her sudden reluctance to complete the responsibilities associated with her position.  Thus, Solano-Reed failed to demonstrate a causal connection.

**D.    Violation of Michigan Public Policy**

Last, Solano-Reed asserts a cause of action for a violation of Michigan public policy.  She argues that although some of her conduct falls within the scope of the Michigan WPA, "most of her efforts went beyond this [activity] where [she] objected to the Defendants' unlawful testing practices, noted what was actually required, and advocated for all 11th graders to be tested."  (Doc. 54 at 20).  Thus, she argues her actions are protected by Michigan public policy.

Public policy must derive from objective sources.  Kimmelman v. Heather Downs Mgmt. Ltd., 753 N.W.2d 265, 268 (Mich. Ct. App. 2008).  "[W]here there exists a statute explicitly proscribing a particular adverse employment action, that statute is the exclusive remedy, and no other 'public policy' claim for wrongful discharge can be maintained."  Id.   Public policies enumerated by the Michigan Supreme Court in the

14

wrongful termination arena include "an employee exercising a right guaranteed by law, executing a duty required by law, or refraining from violating the law." Id.

Solano-Reed's separate claim for a violation of Michigan public policy fails. The WPA provides protection for anyone who "reports or is about to report, verbally or in writing, a violation or suspected violation of a law or regulation or rule." M.C.L. § 15.362. She argues that her noting and objecting to the testing procedures of CCAHS during meetings constitutes activity outside the scope of the WPA and protected by public policy and The State School Aid Act of 1979. See M.C.L. § 388.1601 *et seq.* However, her actions are not protected by an objective and articulated source of public policy outside of the WPA, nor did she point to any controlling authority to support her position. Her actions are merely collateral to reporting CCAHS's alleged violations of the law. Solano-Reed was not forced or coerced into violating any laws by anyone. She was not involved in actually carrying out the MME testing; thus, her mere refusal to violate the State School Aid Act is no more protected by a separate theory of public policy than an individual's conscious refusal to break traffic laws while driving. Consequently, because these activities fall within the scope of the WPA, Solano-Reed's public policy claim fails.

## IV.   CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

s/Marianne O. Battani<br>
MARIANNE O. BATTANI<br>
UNITED STATES DISTRICT JUDGE

DATE:  February 11, 2013

15

CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Order was served upon all parties of record, electronically.

s/Bernadette M. Thebolt
Case Manager